UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

|                          |     |                                     |
|--------------------------|-----|-------------------------------------|
| MICKEL G. HOBACK         | )   |                                     |
|                          | )   |                                     |
| Plaintiff,               | )   |                                     |
|                          | )   | Case No. 1:10-CV-74                 |
| v.                       | )   |                                     |
|                          | )   | Chief Judge Curtis L. Collier       |
| CITY OF CHATTANOOGA       | )   |                                     |
|                          | )   |                                     |
| Defendant.               | )   |                                     |

## M E M O R A N D U M

Before the Court is Defendant City of Chattanooga's ("City") motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, or, in the alternative, a new trial under Rule 59 (Court File No. 74). The City also sought a new trial on damages for back pay, front pay, and emotional distress, or in the alternative remittitur (*id.*). Plaintiff Mickel Hoback ("Plaintiff") responded to the City's motion (Court File No. 78), and the City replied to Plaintiff's response (Court File No. 79). For the reasons discussed below, the Court will **DENY** the City's motion for judgment as a matter of law or a new trial, **GRANT IN PART AND DENY IN PART** the City's motion to remit the jury's award of back pay, and **DENY** the City's motion for a new trial for back pay, front pay, and emotional distress, and for remittitur as to front pay and emotional distress (Court File No. 74).

## I.    BACKGROUND

Plaintiff was hired as a police officer by the Chattanooga Police Department ("CPD") on July 21, 2000. In 2002, Plaintiff took a brief leave from the CPD to enter basic training for the United States Army. Following basic training, Plaintiff returned to the CPD until June 22, 2004, when his National Guard unit was activated and deployed to Iraq. Plaintiff served in Iraq until being

honorably discharged on November 27, 2005. In February, 2006 Plaintiff resumed his duties as a CPD police officer.

At some point after returning from Iraq, Plaintiff was diagnosed with Post-Traumatic Stress Disorder ("PTSD"). Plaintiff received counseling and treatment, including psychotropic medication, from the Veterans Administration ("VA"). On April 13, 2009, Plaintiff met with Dr. Estella Acosta of the VA. During the course of the meeting, Dr. Acosta became concerned that Plaintiff was suicidal and dangerous. She filled out a Certificate of Need for Involuntary Commitment, which stated Plaintiff was "depressed and despondent and states that he is feeling suicidal," and further said "[Plaintiff] indicated using a gun although he stated he does not own a gun." Plaintiff was not involuntarily committed, however; apparently he slipped out the back door of the clinic while Dr. Acosta was making arrangements for his committal.

After leaving the VA clinic, Plaintiff drove himself to the VA hospital in Murfreesboro, Tennessee and checked himself in. He was kept overnight, and released the next day. The CPD became aware of the attempted involuntary commitment of Plaintiff on April 14, 2009. On that date, the Bradley County Sheriff's Department called CPD to inform CPD it was attempting to serve emergency committal papers on Plaintiff, and to ask CPD's help in locating Plaintiff. After some investigation, CPD discovered Plaintiff had already checked himself into the VA hospital. Also on April 14, 2009, Freeman Cooper, CPD Chief of Police, wrote a letter relieving Plaintiff from duty, and placing him on administrative leave. The letter further stated Plaintiff would be required to complete a "fitness for duty" psychological examination.

In April and May, 2009, Donald L. Brookshire, Psy.D., met with Plaintiff several times to conduct the fitness for duty psychological examination. In a seven-page, single-spaced report, Dr.

Brookshire concluded Plaintiff was "not psychologically fit to safely perform the duties as a police officer." Following this evaluation, Plaintiff was told he needed to either apply for another position with the City, or file for Family Medical Leave Act ("FMLA") benefits. Plaintiff did neither. Subsequently, Plaintiff requested a second evaluation be performed by another psychologist. In June and July, 2009, Plaintiff was evaluated by Terrell M. McDaniel, Ph.D. Dr. McDaniel's report, while acknowledging Dr. Brookshire's conclusion may have been justified at the time, concluded Plaintiff was now fit for duty as a police officer. However, the report advised that "adequately monitoring Mr. Hoback's behavior and mental health status will be essential but difficult," and recommended he be placed in "a position that provides acceptable levels of monitoring at the beginning of his re-engagement," and continue receiving intensive counseling and psychological monitoring for at least 90 days.

On July 21, 2009, after Plaintiff had exhausted all his personal leave time, Chief Cooper terminated Plaintiff's employment with the CPD based on Dr. Brookshire's determination Plaintiff was not fit for duty. Chief Cooper did not significantly rely upon Dr. McDaniel's report, because he viewed its conditions regarding the need to continue actively monitoring Plaintiff as belying the formal conclusion that Plaintiff was now fit for duty. He was, however, made aware of its contents (Court File No. 75-2, Cooper Test., p. 16). Following his termination, Plaintiff exercised his right to appeal to a panel of the Chattanooga City Council. After a hearing on November 9, 2009, his termination was upheld by a 2-1 vote.

On April 12, 2010, Plaintiff filed suit in this court alleging claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"); the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* ("Rehabilitation Act"); and 42 U.S.C. § 1983 (Court File No. 1). Upon leave of the

3

Court (Court File No. 16), Plaintiff amended his complaint to remove the § 1983 claim and add a claim under the Uniform Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. § 4301-4335, and its attendant regulations in 20 C.F.R. § 1002. Plaintiff then filed a motion for summary judgment on his claims (Court File No. 25), and a supplemental motion for summary judgment (Court File No. 31). The City responded with its own motion for partial summary judgment as to the USERRA claim (Court File No. 29). The Court denied both of Plaintiff's motions but granted the City's (Court File No. 47). On September 9, 2011, the case proceeded to trial on Plaintiff's remaining claims. The jury returned a verdict in favor of Plaintiff on September 15, 2011, awarding him $130,000 in back pay, $300,000 in front pay, and $250,000 for emotional distress for a total award of $680,000 (Court File No. 63). The City filed this motion for judgment as a matter of law or for a new trial on October 13, 2011, objecting to the verdict and the computation of damages (Court File No. 74).

## II.    LEGAL STANDARDS

Rule 50 of the Federal Rules of Civil Procedure states "if a party has been fully heard on an issue during a jury trial and the [C]ourt finds [] a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [the] issue, the [C]ourt may: (a) resolve the issue against the party; and (b) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on [the] issue." Fed. R. Civ. P. 50(a)(1). If the Court denies the Rule 50(a) motion and submits the action to the jury, the party may renew the motion under Rule 50(b) after the entry of judgment. In considering the renewed motion, the "'[C]ourt is to review all evidence and draw all reasonable inferences in the light most favorable to the non-moving party, without making credibility

4

determinations or weighing the evidence.'" *Jones v. Nissan North America, Inc.*, 438 Fed. Appx. 388, 398 (6th Cir. 2011) (quoting *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388 (6th Cir. 2008)). Therefore, in order for the City to succeed, it must show "no reasonable juror could have found for the nonmoving party." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999).

In the alternative, the City moves the Court for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. Under Rule 59, the Court may grant a new trial only "when a jury has reached a 'seriously erroneous result as evidenced by (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion." *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996)). The Court, however, "[is] not free to reweigh the evidence or set aside the jury verdict merely because the jury could have drawn different inferences or conclusions." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000) (referencing *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). A court should not grant a new trial on the grounds the verdict is against the weight of the evidence "unless the verdict was unreasonable"; that is, "if a reasonable juror could reach the challenged verdict, a new trial is improper." *Id.* at 820-21 (quotations omitted); *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) ("[T]his court will overturn a grant of a motion for a new trial on the basis that the verdict was against the weight of the evidence where it is clear that the jury verdict was reasonable.").

Although both standards discuss the reasonableness of a jury verdict, the standard for granting a new trial is less stringent than the standard for granting a judgment as a matter of law.

*Denhof*, 494 F.3d at 543 ("[G]ranting a judgment as a matter of law is governed by a higher showing [than granting a new trial]."). Judgment as a matter of law requires "no legally sufficient basis for a reasonable jury to find for that party on that issue," Fed. R. Civ. P. 50(a), whereas a new trial may be granted where the verdict is "clearly against the weight of the evidence." *Denhof*, 494 F.3d at 543. Therefore, where the Court determines the evidence was sufficient for a reasonable jury to grant the challenged verdict, it is speaking of the lower standard for granting a new trial. By necessity, evidence sufficient to withstand a new trial challenge will be sufficient to withstand a motion for judgment as a matter of law. *Id.* (reversing a district court's grant of a judgment as a matter of law and alternative grant of a new trial, but focusing only on the motion for a new trial, because "[by] extension, this analysis applies to reverse the judgment as a matter of law as well").

## III. DISCUSSION

The City argues the evidence at trial demonstrates no reasonable jury could have determined (1) the City regarded Plaintiff as disabled and discriminated against him (Court File No. 75, p. 6); or (2) Plaintiff was a qualified individual who could perform the essential functions of a police officer (Court File No. 75, p. 14-15). While the Court finds the City's arguments to be nonfrivolous, the Court concludes a reasonable jury could have reached the verdict reached, and therefore the City's motion for judgment as a matter of law and for a new trial must be denied.

### A. ADA Claim

Under the ADA, an employer may not "discriminate against a qualified individual with a disability." 42 U.S.C. § 12112(a). Plaintiff had the burden at trial to prove he was disabled and he was a qualified individual. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007). An individual is "disabled" under the ADA if he has "(A) a physical or mental impairment that

substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the "regarded as" prong in (C), an individual must only show he was regarded as having a perceived impairment, and does not need to prove his perceived impairment would substantially limit a major life activity. *Id.* § 12102(3)(A).[1] A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of [the] employment position." 42 U.S.C. § 12111(8). Such reasonable accommodations include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . and other similar accommodations." *Id.* § 12111(9)(B). However, an individual who is only "regarded as" disabled must be able to perform the essential functions of the job without reasonable accommodation. 42 U.S.C. § 12201(h) ("A covered entity . . . need not provide a reasonable accommodation . . . to an individual who meets the definition of disability in section 12102(a) . . . solely under subparagraph (C) of such section.").

## 1. Disability

The City argues the evidence presented at trial was insufficient for a reasonable jury to conclude the City regarded Plaintiff as disabled and discriminated against him (Court File No. 75,

---

[1] This is a recent change that was made to the ADA as a part of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"). Pub. L. No. 110-325, § 4(a), 122 Stat. 3553 (2008). Before the ADAAA, a plaintiff making a "regarded as" claim was required to show he was regarded as having an impairment that substantially limited a major life activity. *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001) ("It is not enough that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA.") (quotation omitted). Because the events at issue in this case occurred after January 1, 2009, the Court applies the ADAAA. *Wurzel v. Whirlpool Corp.*, No. 10-3629, 2012 WL 1449683, at *8 (6th Cir. April 27, 2012) ("[W]ith regard to events occurring before January 1, 2009, the ADA applies; with regard to events occurring in and after 2009, the amended version of the ADA— i.e., the ADAAA—applies.").

p. 6). Specifically, the City argues it only regarded Plaintiff as incapable of performing the functions of a police officer, and did not regard Plaintiff's condition as substantially limiting any major life activity (*id.* at 4-6). In support of this argument, the City cites *Epps v. City of Pine Lawn*, 353 F.3d 588 (8th Cir. 2003) and *Sheehan v. City of Gloucester*, 321 F.3d 21 (1st Cir. 2003). Both of these cases involved municipalities terminating police officers, and in both cases the courts held the cities did not regard plaintiffs as disabled because they did not regard them as being substantially limited in any major life activity. *Epps*, 353 F.3d at 592; *Sheehan*, 321 F.3d at 26. Instead, the cities merely regarded the officers as unable to perform the duties of a police officer, which was insufficient to show they regarded plaintiffs as being substantially limited in the major life activity of working. *Epps*, 353 F.3d at 592; *Sheehan*, 321 F.3d at 26.

This argument would have been convincing, and perhaps determinative, if the relevant events in this case occurred before January 1, 2009. However, because the events occurred after January 1, 2009, the ADAAA applies to the City's conduct. *Wurzel v. Whirlpool Corp.*, No. 10-3629, 2012 WL 1449683, at *8 (6th Cir. April 27, 2012) ("[W]ith regard to events occurring before January 1, 2009, the ADA applies; with regard to events occurring in and after 2009, the amended version of the ADA— i.e., the ADAAA—applies."). To be liable under the "regarded as" prong as amended by the ADAAA, a defendant need not regard an individual as substantially limited in a major life activity. 42 U.S.C. § 12102(3)(A). A plaintiff must only show that he was "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity." *Id.*; *Wurzel v. Whirlpool Corp.*, No. 3:09CV498, 2010 WL 1495197 (N.D. Ohio April 14, 2010), *aff'd*, 2012 WL 1449683 (6th Cir. 2012). Therefore, if a reasonable jury could have concluded the City terminated Plaintiff because

8

of an actual or perceived physical or mental impairment–in this case, PTSD–then this ground is insufficient to grant the City's motion.

A reasonable jury could have concluded, based on the evidence submitted at trial, the City terminated Plaintiff because of the reports submitted to CPD management regarding Plaintiff's PTSD. In fact, in its motion for judgment as a matter of law, the City admits Plaintiff's termination was based on Chief Cooper's belief that Plaintiff's PTSD disqualified him to perform the essential functions of a police officer (Court File No.75, p. 8) ("Dr. Brookshire provided a medical report to Chief Cooper that informed the Chief that Hoback was not fit for duty in May 2009 and Chief Cooper informed Hoback that he could not continue as a police officer due to that medical determination."); (Court File No. 75-2, Cooper test., p. 8) ("I terminated Mickel Hoback, after he exhausted all of his leave and personal time, based on the fact that he was deemed to be unfit by Dr. Brookshire and not free of any and all mental disorders."). Based on the evidence submitted at trial, a reasonable jury could conclude the City regarded Plaintiff as disabled, and terminated him on the basis of an actual or perceived mental impairment. The City's argument as to that issue fails.

### 2. Qualified Individual

The more difficult question is whether Plaintiff is a qualified individual who could perform the essential functions of the job. Where, as here, a plaintiff brings a "regarded as" claim, he must show he is a qualified individual without the benefit of any reasonable accommodation; that is, he must show he can perform the essential functions of the job as it is normally performed. 42 U.S.C. § 12201(h); *Wurzel*, 2012 WL 1449683, at *9 n.13 ("As a plaintiff bringing a 'regarded as' claim, [plaintiff] would not be entitled to the benefit of a reasonable accommodation. Thus, the question of his qualification must be decided without regard to any potential accommodation.") (citation

omitted). The ADA limits its scope of protection and excludes otherwise qualified individuals who pose "a 'direct threat' to the health or safety of others that cannot be eliminated by a reasonable accommodation." *Holiday v. City of Chattanooga*, 206 F.3d 637, 647 n.4 (6th Cir. 2000) (citing 42 U.S.C. §§ 12111(3), 12113(b)). A plaintiff in a "regarded as" claim is also not entitled to reasonable accommodation in the direct threat determination. *Wurzel*, 2012 WL 1449683, at *9 n.13.

The City's argument necessarily blends the essential functions and direct threat analyses, and indeed in this case these analyses go hand-in-hand. In fact, some courts have considered the burden to be on plaintiff in cases where the essential functions of the job implicate the safety of others. *See Equal Employment Opp. Comm'n v. Amego, Inc.*, 110 F.3d 135 (1st Cir. 1997) (concluding "it is the plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore 'qualified.'"). Others treat it as a defense with the burden on the defendant. *See Equal Employment Opp. Comm'n v. Wal-Mart Stores, Inc.*, 477 F.3d 561 (8th Cir. 2007). However, the Sixth Circuit has yet to rule on this matter. *Wurzel*, 2012 WL 1449683, at *9 n.14 (citing conflicting cases in other circuits but declining to decide the issue). Because the Sixth Circuit has referred to the direct threat inquiry as a "defense," *Hamlin v. Charter Tp. of Flint*, 165 F.3d 426, 431 (6th Cir.1999), the Court treats it as such, as have other district courts in the Sixth Circuit. *See Equal Employment Opp. Comm'n v. Santa Fe Ry. Co.*, 621 F.Supp.2d 587 (W.D. Tenn. 2009); *Equal Employment Opp. Comm'n v. Overnite Transp. Co.*, No. 2:02CV591, 2006 WL 2594479 (S.D. Ohio. July 5, 2006). The Court, then, will consider the essential functions analysis and the direct threat defense separately.

### a. Essential Functions

In support of its argument regarding the essential functions of the position, the City cites two

cases in which courts concluded as a matter of law a police officer was incapable of performing various essential functions and one similar case regarding a firefighter (Court File No. 75, pp. 11-12) (citing *Simon v. St. Louis County, Missouri*, 735 F.2d 1082 (8th Cir. 1984) (police officer); *Champ v. City of Baltimore County*, 884 F.Supp. 991 (D. Md. 1995) (police officer); *Burch v. City of Nagodoches*, 174 F.3d 615 (5th Cir 1999) (firefighter)).  However, each of these cases dealt with a plaintiff who suffered a physical limitation.  Plaintiff here is only incapable of performing the essential functions of his job to the extent his supervisors believed he posed a danger to himself and others while employed.  For the purposes of this motion, the Court will assume the jury concluded the essential functions of the position of police officer were those described by Chief Cooper in his testimony (Court File No. 75-2, Cooper Test., p. 9), and relied on by the City in its motion (Court File No. 75, p. 12):

> Police officers are individuals that are not just working a 9:00-to-5:00 job. They're people that are distinguished by a uniform. They wear a badge and a gun. They expose themselves to danger. They carry assault weapons. They have to be able to make split-second decisions, life-and-death decisions that may take someone's life or take someone's freedom away. They have to be of sound mind, clear-thinking, able-bodied people in good physical health and mental health. And they have to be able to control themselves in very, very high situations at some times without losing control themselves, being able to maintain calmness and to restore calm and peace in these situations. And they have to be able, counted on, relied upon by myself and the citizens that they serve, to use only the amount of force necessary when dealing with situations and citizens that's deemed necessary to control that situation, up to and including taking someone's life.

In support of its argument Plaintiff was not qualified to perform the essential functions of the position, the City notes Plaintiff's diagnosis with severe PTSD by the VA, involuntary commitment by a VA psychiatrist, Plaintiff's medication, and Plaintiff's VA Counselor's notes detailing Plaintiff's descriptions of various violent thoughts and acts.  The evidence the City relies on was presented at trial and the jury was in a position to consider it with the testimony of Plaintiff

himself and Chief Cooper who terminated Plaintiff. Most notably, on direct examination, Plaintiff detailed his version of multiple events mentioned in Counselor Bearden's notes and relied on by Dr. Brookshire in his report, which convinced Chief Cooper to terminate Plaintiff's employment (Court File No. 70, Hoback Test., pp. 42-52). Included in Plaintiff's testimony was discussion of embellishments he made to Counselor Bearden in order to receive larger benefits from the VA (*id.* at pp. 47-49). He also noted the only side effects from his medication were headaches and nausea. Further, Plaintiff detailed some of his experiences in the military (*id.* at pp. 11-16), on which a reasonable jury could rely to conclude he was capable of withstanding the types of stresses Chief Cooper acknowledged in his essential functions discussion. Finally, as the City concedes in its motion for judgment as a matter of law, "three different experts with the same psychological licenses in the State of Tennessee have offered conflicting opinions at trial regarding the severity of the mental condition of Officer Hoback," including two who thought Plaintiff was fit to perform the functions of a police officer even considering his condition (Court File No. 75, p. 3-4).

The events as relayed to Counselor Bearden would concern any supervisor, particularly a supervisor of a police officer. But the question presented to the jury was whether Plaintiff could perform the essential functions of the position. 42 U.S.C. § 12111(8). A reasonable jury could have heard all the evidence and placed significant weight on Plaintiff's explanation of Counselor Bearden's notes, discounted his embellishments to his VA Counselor, weighed the credibility of the testifying mental health professionals, and concluded the evidence presented was sufficient to show Plaintiff could perform the essential functions of the position.

**b. Direct Threat**

12

The City argues Plaintiff was a "direct threat" to the health and safety of others in his workplace (Court File No. 75, p. 10). In a direct threat defense, a defendant must show its determination the plaintiff posed a direct threat was premised on "'an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question.'" *Wurzel*, 2012 WL 1449683, at *10 (quoting *Holiday*, 206 F.3d at 643). "This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). The decision of the employer or its medical professionals who made the decision must also be "objective[ly] reasonable[]" in light of available medical evidence. *Wurzel*, 2012 WL 1449683, at *10 (citing *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998)).

After determining the sufficiency of an employer's termination procedures, the next step is determining whether the plaintiff "meets the standard for posing a direct threat." *Wurzel*, 2012 WL 1449683, at *14 ("Having concluded that [defendants] engaged in a sufficient process, and that the conclusions it reached were objectively reasonable based upon [plaintiff's] medical condition, the remaining question is whether these conclusions about [plaintiff's] condition meet the standard for posing a direct threat."). This analysis is rooted in a consideration of four factors provided by 29 C.F.R. § 1620.29(r): "(i) [T]he duration of the risk [posed by plaintiff], (ii) the nature and severity of the potential harm, (iii) the likelihood that the potential harm will occur, and (iv) the imminence of the potential harm." *Id.* at *9. The risk must be significant; it cannot be speculative or remote. *Id.*

First, the City argues its procedures were adequate (Court File No. 75, pp. 14-15). It points to the fitness determination performed by Dr. Brookshire (Court File No. 75-4, Def. Ex. 2), which

was based on the notes taken by VA Counselor Bearden and Dr. Brookshire's own in-person evaluation (Court File No. 75-5, Plaintiff Ex. 18). It also points to Plaintiff's testimony at trial admitting to the embellishments and falsehoods he related to Counselor Bearden (Court File No. 75-1, Hoback Test.). In these sources, the City highlights Plaintiff's diagnosis with severe PTSD by the VA and involuntary commitment by a VA psychiatrist (Court File No. 75, p. 3). It also emphasizes Plaintiff's VA Counselor's notes detailing Plaintiff's descriptions of various violent thoughts and acts (Court File No 75-1, p. 1) ("[Plaintiff] described nightmares, intrusive thoughts, and loss of control of his anger. He stated on several occasions he has 'choked' or hit people he is interacting with when he has gotten mad (including fellow police officers . . . ).") The City argues, considering Plaintiff's claims to his VA Counselor about violent episodes, a judgment in his favor puts the City in the impossible position of choosing between retaining high-risk employees and subjecting itself to possible § 1983 claims, or dismissing high-risk employees and subjecting itself to ADA claims (Court File No. 75, p. 10).

Although the Court is sensitive to the City's dilemma, the Court may not "set aside the verdict [even if] it believes [] another outcome is more justified." *Denhof*, 494 F.3d at 543. There was sufficient evidence for a reasonable jury to conclude the City's evaluation of Plaintiff was not based on the best objective medical evidence. For instance, prior to firing Plaintiff, Chief Cooper was aware of a determination by Dr. McDaniel finding Plaintiff fit for duty, although he also recommended certain actions on the part of the police department (Court File No. 75-2, Cooper Test., p. 16). When asked if that decision affected his opinion regarding Plaintiff's qualification, Chief Cooper responded, "Absolutely not. He was either fit for duty or not fit for duty. And if he was

only fit for duty based on a number of conditions, then that was not fit for duty" (*id.*).[2]

A reasonable jury could have concluded Dr. McDaniel's findings reflected poorly on the soundness of Dr. Brookshire's conclusions and should have been considered by Chief Cooper before termination. Further, the jury could have emphasized the corroborating report by Dr. Walker as more evidence that Dr. Brookshire's report was insufficient under the ADA. For example, Dr. Brookshire failed to consider Plaintiff's explanations for events from Counselor Bearden's notes (Court File No. 70, Hoback Test., p. 42),[3] whereas the other two doctors either discounted the events for lack of corroborating information (Court File No. 25-4, McDaniel Report, p. 13), or heavily considered those explanations (Court File No. 75-6, Walker Report, p. 5-6). Dr. Brookshire also failed to consider the circumstances of Plaintiff's commitment (Court File No. 75-4, Def. Ex. 2, p. 5), including that it occurred under some controversy and he was immediately discharged the following day. Drs. Walker and McDaniel both discounted the commitment after investigating the

---

[2] Because Plaintiff proceeded on a "regarded as" theory, Chief Cooper was correct that he was not required to provide any accommodations recommended by Dr. McDaniel. However, a reasonable jury could have concluded Dr. McDaniel's determination cast doubt on the reliability of Dr. Brookshire's report, and therefore Chief Cooper did not rely on the best available medical evidence.

[3] Hoback: "Those [topics discussed with Dr. Brookshire] would be–More or less we covered some things in [Counselor Bearden's] notes. I think we covered an incident–He asked me a couple of instances that were in the notes. One of them was, I guess, about a lawyer that I had got in an argument with. Another one was another incident that was in there. He asked me more or less about Mike Bearden's notes. And as I tried to explain them to him, he didn't want to hear anything. He said I was minimizing everything in the notes."

Attorney: "Did you ask him anything about verifying with your fellow workers information?"

Hoback: "There was an incident which will come up where it says I choked or punched fellow officers. I advised him what had happened with me and this other officer, 'That's not actually what happened.' I said, 'You can call him and check.' And he said, 'I'm sure he would lie for you. He's your buddy.'"

circumstances surrounding it (Court File No. 25-4, McDaniel Report, pp. 12-13); (Court File No. 75-6, Walker Report, p. 25).

Based on these discrepancies, a reasonable jury could have considered Dr. Brookshire's report to lack the type of individualized inquiry or reasonable medical judgment required by the ADA. *See Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000) (holding a material issue of fact existed where the city relied on only one doctor's report and it lacked a sufficient individualized inquiry or basis in objective scientific and medical evidence). The jury could have determined Chief Cooper's nearly sole reliance on Dr. Brookshire's report, and failure to consider Dr. McDaniel's conclusions, to indicate his determination was not based on "the best available objective evidence." *See Justice v. Crown Cork and Seal Co.*, 527 F.3d 1080 (10th Cir. 2008) (finding a material issue of fact existed regarding a "direct threat" defense in part because the employer relied on one medical opinion and ignored subsequent conflicting opinions); *see also Wurzel*, 2012 WL 1449683, at *16 (granting summary judgment for defendant in part because a jury could not find there was contrary medical evidence where two doctors reached the same conclusion).

Second, the jury could have determined Plaintiff was not a direct threat under the four-factor test provided by C.F.R. § 1620.29(r). *Wurzel*, 2012 WL 1449683, at *14. First, the jury could have determined duration of the risk was too short, or even nonexistent, to pose a significant threat of harm given the testimony of Drs. McDaniel and Walker agreeing Plaintiff was relatively asymptomatic. Two doctors providing testimony for the jury, Dr. McDaniel and Dr. Walker, concluded Plaintiff was fit for duty. Dr. Walker concluded Plaintiff's PTSD was in remission and he was not currently a threat to himself or others (Court File No. 75-6, Walker Report, p. 25). Dr. McDaniel similarly concluded Plaintiff was not experiencing significant symptoms (Court File No.

16

25-4, McDaniel Report, p. 15). Further, the violent episodes detailed in Dr. Brookshire's report were uncorroborated and Plaintiff testified extensively and provided explanations for their presence in Counselor Bearden's notes. The jury could have concluded Plaintiff had performed his duties without significant incident and relied on that determination to find he did not pose a significant threat of harm in the future. Second, the jury could have concluded the nature and severity of the potential harm was low, as the jury could have considered Plaintiff's explanations of his symptoms and Drs. McDaniel and Walker's analyses more credible than Dr. Brookshire's. Third, the jury could have similarly concluded the likelihood the potential harm will occur was low after considering the testimony of the doctors and Plaintiff. Finally, the jury could have found the potential harm lacked imminence by relying on testimony stating Plaintiff's symptoms had dissipated and his condition was in remission (Court File No. 75-6, Walker Report, p. 25).

The City primarily relies on *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284 (10th Cir. 2000) and *Burroughs v. City of Springfield*, 163 F.3d 505 (8th Cir. 1998), to argue Plaintiff posed a direct threat and thus was not a qualified individual. In *Borgialli*, the plaintiff was a "blaster" for a mining company who began suffering from dizziness, blurred vision, and nausea. The plaintiff was given a restricted medical release such that he should not be permitted to operate heavy machinery. However, the mine allowed plaintiff to return to work. Subsequently, plaintiff's supervisor, with whom he had a contentious relationship, gave him a negative performance evaluation. Plaintiff then admitted thoughts of suicide to a former supervisor and the mine's nurse. He saw a counselor who did not indicate plaintiff could return to work. Plaintiff later saw a psychiatrist who found he could not safely perform the work as a blaster. Of particular note to the City in this case, the plaintiff in *Borgialli* then sought evaluation from another psychiatrist who

17

determined he was capable of performing his duties but not capable of managing a relationship with his supervisor.  After the mine requested the plaintiff see another evaluation, plaintiff refused and the mine would not allow him to return to work.  The Tenth Circuit held plaintiff in this case was a direct threat and that "no reasonable jury could fault the Mine for its decision to preclude Plaintiff's return to work *until it received assurance from a doctor that Mr. Borgialli no longer posed a safety risk*." *Id.* at 1294 (emphasis added).

In *Burroughs*, the plaintiff was a diabetic police recruit who, while serving as a recruit, had two diabetic hypoglycemic episodes during which he became disoriented and could not perform his duties.  An evaluating physician concluded he could be danger to the public if another episode occurred, and that the episodes could be avoided if the plaintiff would more appropriately monitor his diet.  Although the Eighth Circuit determined the plaintiff was not terminated because of his disability, it also discussed the direct threat defense.  The plaintiff argued the doctor's opinion was speculative but the court noted the doctor's opinion relied on two undisputed episodes that created a risk "of an armed patrol officer being unable to function in an emergency situation." *Burroughs*, 163 F.3d at 508.  Accordingly, the court held "[t]he City's decision to remove [plaintiff] from duty was appropriately based on objective evidence and reasonable medical judgment." *Id.*

The case at issue is readily distinguishable from *Borgialli* and from *Burroughs*.  In *Borgialli*, the Tenth Circuit relied on the determination plaintiff could not manage a relationship with his supervisor and on plaintiff's refusal to undergo another medical evaluation.  Here, Plaintiff not only consented to a second medical opinion but sought a third as well.  Both of the opinions subsequent to Dr. Brookshire's found Plaintiff fit for duty.  Unlike the plaintiff in *Borgialli*, any caveats in the doctors' reports were relevant to continued counseling and alcohol screening, not the ability to

engage with supervisors or any similar concerns that would encumber Plaintiff's on-the-job performance. Where the Tenth Circuit believed no reasonable jury could fault the mine until it received a favorable opinion by a doctor, the jury here could rely on Dr. McDaniel's opinion to fault the City in its termination of Plaintiff. Additionally, it could consider Dr. Walker's opinion further evidence the City's determination Plaintiff posed a direct threat was incorrect.

Similarly, the determination to terminate the plaintiff in *Burroughs* arose from a medical report based on *uncontroverted* episodes. Here, the episodes on which Dr. Brookshire's report primarily focused were disputed, and evidence was provided to the effect they either did not occur or Dr. Brookshire's interpretation of them was incorrect. Plaintiff in this case also provided two evaluations by other doctors concluding the episodes at issue either did not occur, or discounting their importance given the lack of corroboration and surrounding circumstances. A reasonable jury could conclude the disputed episodes in this case did not occur and Plaintiff therefore did not pose a direct threat.

Because the evidence was sufficient for a reasonable jury to conclude Plaintiff was a qualified individual capable of performing the essential functions of a police officer and did not pose a direct threat to himself or others in his workplace, the City's motion must be **DENIED**. Because the Court finds there was sufficient evidence to sustain the jury's verdict under the ADA, discussion of Plaintiff's Rehabilitation Act claim is unnecessary.

### B. Damages

The jury awarded Plaintiff $130,000 in back pay, $300,000 in front pay, and $250,000 for emotional distress for a total award of $680,000 (Court File No. 63). The City argues the damages awarded by the jury are excessive and have not been calculated correctly (Court File No. 75, p. 20).

The City seeks a new trial to recalculate damages, or in the alternative, remittitur.

"New trials are not to be granted on the grounds that the verdict was against the weight of the evidence 'unless that verdict was unreasonable.'" *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 820-21 (6th Cir. 2000) (quoting *Holmes*, 78 F.3d at 1047). "A verdict is not excessive unless it exceeds 'the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss.'" *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 424-25 (6th Cir. 1999) (quoting *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 397 (6th Cir. 1993)). "An award must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." *Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 443 (6th Cir. 2000) (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996)).

Short of ordering a new trial, a court may reduce a jury award pursuant to Rule 59(e) if the award "clearly exceeds" the maximum amount a jury reasonably could have found was necessary to compensate the prevailing party for its loss. *Slayton v. Ohio Department of Youth Services*, 206 F.3d 669, 679 (6th Cir. 2000); *see also Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994). The court may reduce the award only if it is "(1) beyond the range supportable by proof, (2) so excessive as to shock the conscience, or (3) the result of mistake." *Slayton*, 206 F.3d at 679; *see also Farber v. Massillon Bd. of Ed.*, 917 F.2d 1391, 1395 (6th Cir. 1990) (holding remittitur is appropriate if the award results from passion, bias, or prejudice); *Cathey v. Johns-Manville Sales Corp.*, 776 F.2d 1565, 1572 (6th Cir. 1986) (holding remittitur is appropriate only if the award is "shocking or contrary to all reason"). Remittitur is not appropriate simply because an award is "extremely generous"; rather, it is allowed only when an award is "grossly disproportionate" to the adduced evidence. *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir.1999), *cited in*

*Slayton*, 206 F.3d at 679-80.  In making its determination, the court must review the evidence in a light most favorable to the prevailing party.  *Jackson*, 31 F.3d at 1359 (citations omitted).

### 1. Back Pay

The City argues the jury's award of $130,000 is excessive because (1) Plaintiff did not mitigate his damages, (2) the award does not take into account some minor income Plaintiff made between his termination and trial, and (3) the award is based on a higher salary than the evidence presented at trial showed.

### a. Mitigation

The burden to demonstrate failure to mitigate is on the defendant, who must show substantially equivalent positions were available and the plaintiff did not use reasonable diligence to seek them out.  *Taylor v. Invacare Corp.*, 64 F. App'x 516, 523 (6th Cir. 2003).  A substantially equivalent position affords the terminated employee "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status."  *Rasimas v. Michigan Dept. of Health*, 714 F.2d 614, 624 (6th Cir. 1983).  Reasonable diligence is not an onerous burden and is evaluated in "light of the individual characteristics of the claimant and the job market." *Id.*

Here, the City did not meet its burden to show substantially equivalent positions existed or Plaintiff failed to exercise reasonable diligence to locate one.  The City points to evidence Plaintiff was asked to highlight five positions he would be interested in taking other than police officer once it was clear the City would be terminating him.  Of the five positions Plaintiff noted, only two were funded, and one of those two did not begin for a year.  The fifth opportunity, which apparently was the only viable one, was a position answering phones.  Given the different responsibilities, status, and working conditions, the Court cannot say this position was "substantially equivalent" to the

21

position of police officer.  Further, Plaintiff provided evidence he sought full time employment, including at five different police departments (Court File No. 70, Hoback Test., pp. 60-61), and was currently working part time for Graysville Police Department (Court File No. 71, Hoback Test., pp. 50-51).  On the evidence presented, the City failed to meet its burden to prove Plaintiff did not mitigate his damages.

### b. Other Income

The City argues the backpay award should be discounted by the earnings he received from his part time job at Graysville Police Department and his veterans benefits.  A backpay award "should completely redress the economic injury the claimant has suffered as a result of discrimination." *Rasimas*, 714 F.2d at 627. Generally, collateral source benefits should not be deducted from an award of back pay.  *Hamlin v. Charter Tp. of Flint*, 165 F.3d 426, 432 (6th Cir. 1999) (holding pension benefits were a collateral source and should not have been deducted from an award of back pay under the ADA).  "The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing damages owed to a plaintiff by the amount of recovery the plaintiff receives from sources that are collateral to the tortfeasor." *Id.* at 433.  "Applying the collateral source rule in the employment discrimination context prevents the discriminatory employer from avoiding liability and experiencing a windfall, and also promotes the deterrence functions of discrimination statutes." *Id.* at 434 (applying the collateral source rule to the ADA).

Accordingly, the Court will not reduce the back pay award by the amount Plaintiff received in veterans benefits, because the source of those funds is collateral to the City, deducting them would provide the City a windfall, and–as Plaintiff would have received the benefits anyway–deducting them would not completely redress the injury Plaintiff experienced as a result

of his termination.

However, Plaintiff's award should have been offset by the wages he earned in the two years between his termination and trial. Testimony by Plaintiff suggests he made $780 as of the trial in 2011 and between $7,000 and $8,000 in 2010 (Court File No. 70, Hoback Test., pp. 62, 64-65). There was also some discussion at trial of other pay Plaintiff received, at a rate of twenty dollars a night plus some in-kind income, for an occasional security guard position. However this was never more clearly established at trial. Accordingly, the Court will construe the ambiguity against the discriminating employer, *Rasimas*, 714 F.2d at 628 ("[A]mbiguity in what the claimant would have received but for the discrimination should be resolved against the discriminating employer."), and assume Plaintiff's award should take into account $7,780 of wages earned between termination and trial.

### c. Proper Salary

The City argues the jury apparently based its award on total salary and benefit compensation package of $60,000 as testified to by Douglas Kelley, records specialist for the City of Chattanooga. Kelley testified Plaintiff's annual pay was $39,436, but in the previous year Plaintiff earned $43,050.98 because he worked overtime (Court File No. 72, Kelley Test., pp. 14-15, 18). Kelley estimated, accounting for all Plaintiff's benefits, his total compensation was around $60,000. The City disputes the use of the overtime salary as a basis for determining back pay, and argues the total compensation package should have been $55,000 (Court File No. 75, p. 22 n.13).[4] The jury awarded

------

[4] The Court notes the City's decrease of $5,000 is based on nothing specific in the record, but appears to be simply a rounding up from the $3,614.98 difference between Plaintiff's base salary and his salary with overtime. The Court will not replace the jury's judgment with an arbitrary figure.

23

Plaintiff $130,000 for the time between termination on July 21, 2009, and the trial, which ended September 14, 2009. Given the span of time, almost twenty-six months, the jury must have computed their award on the basis of the $60,000 a year figure.[5]

The Court notes the evidence at trial is imprecise in regard to the amount of pay Plaintiff would have been entitled to had the City not terminated his employment and to the amount in wages Plaintiff earned between termination and trial. However, the court is only to grant remittitur where "after reviewing all evidence in light most favorable to the awardee, it is convinced the verdict is clearly excessive." *Farber*, 917 F.2d at 1395. Moreover, where "there is any credible evidence to support a verdict, it should not be set aside." *Id.* Here, although the figures produced at trial were merely rough estimates, the Court cannot say the verdict is clearly excessive. There was credible evidence presented–in the form of Kelley's testimony–that had Plaintiff worked the twenty-six months between termination and trial he would have earned $60,000 a year. Further, overtime is often included backpay computations. *See Woosley v. Avco Corp.*, 944 F.2d 313, 319 (6th Cir 1991) (affirming an award of backpay that included the average overtime worked by plant employees); *Stevens v. Tennessee Valley Authority*, 805 F.2d 1036 (6th Cir. 1986) (affirming a district court computation of backpay that included overtime but discounted the average overtime hours worked based on how much the plaintiff typically worked or for which he was available). However, the award should have been reduced by the approximately $7,780 earned by Plaintiff during that time period. Because Plaintiff worked one week shy of twenty-six months, the Court will also remit

---

[5] Although the Court cannot be sure, it assumes the jury divided the $60,000 figure by twelve and then multiplied the resulting $5,000 figure by twenty six to reach the award of $130,000.

$1,250 from the award of backpay to account for that week.[6]  Accordingly, the Court will remit the

$130,000 figure to $120,970.  It should be noted Plaintiff may either except the remittitur or seek

a new trial, but if he accepts the remittitur he cannot appeal the Court's decision. *McKenna v.*

*Edgell*, 617 F.3d 432, 446 (6th Cir. 2010).

Accordingly, the Court will **DENY** the City's motion for a new trial on back pay, and

**GRANT IN PART AND DENY IN PARTY** the City's motion to remit the back pay award of

$130,000.

### 2. Front Pay

The City makes two arguments in favor of a new trial or remittitur of the jury's award of

front pay: (1) the calculation is excessive and (2) a state court had entered an order of reinstatement,

providing a windfall for Plaintiff.

### a. Calculation of award

The City argues the jury's award of $300,000 front pay is excessive and the jury verdict form

lacks any indication such as a cut-off date, a calculation of present value, and discount for future

employment or other indications for how the jury determined its award.

The City does not refute the Court's determination reinstatement, the preferred remedy in

termination cases, was inappropriate in this case nor does it refute the Court's decision to submit the

issue of front pay to the jury.  Rather, from the City's motion, it only objects to the amount of the

award and the lack of explicit indications in how the jury determined its award.  However, the Court

charged the jury on the factors outlined by the Sixth Circuit in *Roush v. KFC Nat'l Mgmt Co.*, 10

---

[6] Assuming the jury based its award on a figure of $5,000 a month, one out of four weeks
would be worth $1,250.

F.3d 392 (6th Cir. 1993) and *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir. 1985). As long as "the finder of fact has considered the factors necessary to set the amount of the award," it will be upheld. *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1235 (6th Cir. 1996); *see Wells v. New Cherokee Corp.*, 58 F.3d 233, 238-39 (6th Cir. 1995) ("[T]he court specifically instructed the jury on what factors to consider in setting the amount of the award.")

Front pay awards may be reduced if they are speculative or if they exceed the amount a reasonable jury could find to be compensatory. *Reed v. National Linen Service*, No. 97-5545, 1999 WL 407463, at *6 (6th Cir. June 2, 1999). Considering evidence presented at trial noting Plaintiff's compensation was $60,000 a year, his relatively young age, and his continued difficulty finding comparable, full-time employment, the Court cannot say the jury's award was unreasonable. *See Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 666 (6th Cir. 2005) (affirming a grant of over one million dollars in front pay based on the possibility the employee would have worked until age sixty-five); *Reed*, 1999 WL 407463 (finding an award for past and future wages of $185,000 reasonable where the jury heard evidence the plaintiff wanted to continue employment at the location until his retirement); *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994) (affirming a verdict of $249,741 in front pay for a fifty-three year old who had persistently sought work and until settling for a lower paying position).

### b. City Council Proceedings

The City also challenges the front pay award on the grounds the Hamilton County Chancery Court has ordered Plaintiff reinstated. However, after the City filed the instant motion, the Tennessee Court of Appeals vacated the Chancery Court's judgment and remanded to the Chattanooga City Council with instructions to consider Plaintiff's case in accordance with a Consent

Order entered by the Western District of Tennessee.  *Hoback v. City of Chattanooga*, No. 09-0965, 2012 WL 2974762 (Tenn. Ct. App. July 20, 2012).

The City cites *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228 (6th Cir. 1996) for the proposition front pay and reinstatement are "alternative rather than cumulative" awards and courts should ensure "employees who suffer discriminatory discharge be made whole but not receive windfalls."  However, *Suggs* dealt with front pay, characterized by the district court as "additional backpay," awarded in addition to an order of reinstatement to compensate the plaintiff for the time between the conclusion of the trial and "the effective date of the offer of reinstatement." *Id.* at 1231. In other words, *Suggs* dealt with an order of front pay and reinstatement from the same court.

Here, on the other hand, the City asks the Court not to award front pay to Plaintiff in case a City Council determination makes the award duplicative.  Although the City did not argue the point, and its motion fails to explicitly seek any specific relief from the possibility of duplicative awards, the Court determine it seeks abstention on the issue of front pay pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).[7]

*Colorado River* recognized federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," but noted abstention may be appropriate where deference to a parallel state proceeding would promote "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Id.* at 817.  The Court did note, however, "the circumstances permitting the dismissal of a federal suit due to the

---

[7] Although abstention under  *Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)  also seems appropriate at first blush, the Sixth Circuit has made clear "*Burford* abstention does not extend to actions seeking monetary relief."  *Devlin v. Kalm*, No. 11-1261, 2012 WL 3241656, at *5 (6th Cir. August 9, 2012) (citing *Gray v. Bush*, 628 F.3d 779 (6th Cir. 2010)). Accordingly, the Court finds *Burford* abstention inappropriate in this case.

27

presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than circumstances appropriate for [other theories of] abstention." *Id.* at 818.

A court will consider a number of factors to determine whether *Colorado River* abstention is appropriate: "(1) whether the state court or the federal court has assumed jurisdiction over the res or property; (2) which forum is more convenient to the parties; (3) whether abstention would avoid piecemeal litigation; (4) which court obtained jurisdiction first; and (5) whether federal law or state law provides the basis for the decision on the merits."  *Devlin v. Kalm*, No. 11-1261, 2012 WL 3241656, at *5 (6th Cir. August 9, 2012) . "Under Colorado River, '[n]o one factor is necessarily determinative,' and the court must undertake 'a careful balancing of the important factors as they apply in a given case, with the balance heavily weighed in favor of the exercise of jurisdiction.'" *Id.*(quoting  *Moses H. Cone Mem'l. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983)).

Applying the factors to this case, with the balance weighed in favor of exercising jurisdiction, the Court does not find abstention appropriate. "The first two factors–assumption of jurisdiction over property and convenience of the forum–are inapplicable."  *Devlin*, 2012 WL 324156, at *5.  The third factor, avoiding piecemeal litigation, is not served by abstention here because the City Council is determining Plaintiff's grievance on the basis of municipal administrative code and cannot hear the attendant federal claim at issue here. *Id.* (finding abstention inappropriate where the federal action involved federal constitutional claims and the state action involved state civil service rules).  The fourth factor, sometimes called the "priority" rule, "should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions."  *Moses H. Cone Memorial Hosp. v. Mercury Const.*

*Corp.*, 460 U.S. 1, 21 (1983). Although the City Council appeal was initiated before the instant action, that appeal has been remanded for rehearing, whereas this case has proceeded through a jury verdict. The fourth factor, then, weighs against abstention. Finally, this case is based on the ADA, a federal statute.

Because the factors weigh against *Colorado River* abstention, and the jury's front pay award is reasonable, the City's motion seeking a new trial or remittitur on the front pay issue is **DENIED**.

### 3. Emotional Distress

Finally, the City argues the $250,000 award for emotional distress should be set aside as grossly excessive. Damages for emotional distress must be proven by "competent evidence" but this does not require medical support. *Moorer v. Baptist Memorial Health Care System*, 398 F.3d 469, 485 (6th Cir. 2005). A plaintiff's burden can be carried by his own testimony and the circumstances of the case. *Id.* Juries are "accorded great discretion in determining the amount of damage awards, [but] damages must be proved; they must not be speculative." *Rodgers v. Fisher Body Div., General Motors Corp.*, 739 F.2d 1102, 1107 (6th Cir. 1984).

The Court cannot say the award in this case was grossly excessive and concludes it was supported by evidence. Plaintiff testified he has had his electricity disconnected such that his daughter cannot stay at his house (Court File No. 70, Hoback Test., p. 63), could not afford medical bills and was pursued by collections agents (*id.* at 67), he has been forced onto food stamps (*id.* at 68), he has sold most of his belongings (*id.*), he was embarrassed by the publicity surrounding the case and felt he was treated differently by members of the public (*id.* at 68-69), and his medical information and mental condition has been made public (*id.* at 69). Further, Dr. Walker's report noted Plaintiff was experiencing symptoms of "an adjustment disorder with anxious mood" as a

result of "the loss of his job, financial worries, and concerns regarding an impending child custody suit brought by his daughter's mother," which have caused him "understandable anxiety and distress" (Court File No. 75-6, Walker Report, p. 25). The evidence presented at trial was sufficient for a jury to base an award of $250,000 for emotional distress.

The City bases its argument solely on *Rodgers v. Fisher Body Div., General Motors Corp.*, 739 F.2d 1102, 1107 (6th Cir. 1984), where the Sixth Circuit held a $300,000 award for emotional distress was unsupported when "[v]irtually the only evidence of the mental stress which plaintiff suffered as a result of his layoff was plaintiff's brief testimony in this regard." The plaintiff in that case testified to a humiliating experience of seeking welfare from the Department of Social Services and having his car repossessed. Here, the case is distinguishable because Plaintiff's testimony was more in depth, it was corroborated by his father's testimony, and it was corroborated by Dr. Walker's report. Further, cases subsequent to *Rodgers* have upheld similar verdicts in cases based on similar evidence. *See Moorer*, 398 F.3d at 486 (affirming an award of $250,000 where plaintiff, his wife, and his doctor testified plaintiff, as a result of his termination, was depressed, experienced anxiety, and was having trouble in his marriage); *Lilley v. BTM Corp.*, 958 F.2d 746, 754 (6th Cir. 1992) (affirming an award of $350,000 proved by testimony of anguish, embarrassment, marital difficulties, weight loss, difficulty sleeping, and psychological treatment by plaintiff and his wife).

Accordingly, the City's motion as to emotional distress damages is **DENIED** and the Court will not remit the award or grant a new trial.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **DENY** the City's motion for judgment as a matter of law or a new trial, **GRANT IN PART AND DENY IN PART** the City's motion to remit the

30

jury's award of  back pay, and **DENY** the City's motion for a new trial for back pay, front pay, and

emotional distress, and for remittitur as to front pay and emotional distress (Court File No. 74).

      An Order shall enter.

                                  **/s/**_____

                                  **CURTIS L. COLLIER**
                                  **CHIEF UNITED STATES DISTRICT JUDGE**